IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF WISCONSIN

DAVID H. KRAABEL,

                         Plaintiff,                           OPINION AND ORDER

    v.

                                                          12-cv-43-wmc

CAROLYN W. COLVIN,
Acting Commissioner of Social Security,

                         Defendant.

Plaintiff David Kraabel seeks judicial review of a decision by the Commissioner of the Social Security Administration denying his application for Disability Insurance Benefits under Title II of the Social Security Act, codified at 42 U.S.C. §§ 416(i) and 423(d) and Supplemental Security Income benefits under Title XVI of the Act, codified at 42 U.S.C. §§ 1381(a) and 1382(a).  Kraabel has filed a motion for summary judgment, arguing that the Commissioner erred in finding that:  (1) the Medical-Vocational Rules directed a finding of not disabled; and (2) his testimony was not credible.  In response, the Commissioner seeks affirmance.  Because there is substantial evidence in the record to support the decision, and no reversible error, the court will deny plaintiff's motion, affirm the Commissioner's decision and dismiss this case.

FACTS

The following facts are drawn from the administrative record (AR):

A.      **Work History, Injury and Application for Benefits**

David Kraabel is a 46-year-old man with a high school diploma and post-school nursing assistant and critical care training.   He has a history of spinal surgery, including a laminectomy in 1998 and fusion of the L4-5 vertebrae and the L5-S1 vertebrae in 2003. (AR 199, 205, 334.)   From 2006 to January of 2008, Kraabel was employed as a photo specialist at a Walgreen's Pharmacy in Viroqua, Wisconsin.   (AR 33, 109-113.[1])   He also has worked as a sales associate, nursing assistant and critical care technician.   (AR 33, 135.)   On January 19, 2008, Kraabel was injured when he slipped and fell on ice in a McDonald's parking lot, landing on his back.   (AR 33, 113.)

On February 29, 2008, Kraabel filed applications for social security disability insurance benefits and supplemental security income benefits.   In those applications, Kraabel alleged that he had been unable to work since January 19, 2008, citing a "disabling condition."   (AR 109-120.)   After considering his age, education and work history, as well as medical records from treating and consulting physicians, the local disability agency denied Kraabel's application -- initially on June 20, 2008, and again upon reconsideration on December 17, 2008.   (AR 59, 66.)   Thereafter, Kraabel requested a hearing before an administrative law judge.

### B.    Medical Records

Kraabel received physical therapy beginning February 5, 2008, but was discharged

---

[1] The page numbers of the certified Social Security Transcript filed by the Commissioner, dkt. 8, do not correspond to the page numbers Bates stamped in the documents comprising the record itself.   Because the ALJ and the parties have cited the Bates-stamped page numbers,

after four treatments for lack of progress.  He reported no improvement with the TENS unit, ice, massage, mobilizations and stretching.  Brad Ferguson, the physical therapist, described Kraabel as "very emotional," and "sometimes crying during treatment" and "unable/unwilling" to adopt posture changes or participate in an active strength and stretching program.  (AR 216-19, 255-56.)

On February 19, 2008, Kraabel began seeing Dr. Maher Fattouh for lower back pain radiating down both legs with numbness in his toes.  (AR 334.)  Dr. Fattouh diagnosed him with postlaminectomy syndrome, lumbar radiculopathy, lumbar/lumbosacral disc degeneration and myalgia/myositis and began treatment with gabapentin and epidural steroid injections.  He noted that Kraabel would be an excellent candidate for an implantable spinal cord stimulator ("SCS") if the injections did not offer long-term relief.  (AR 336.)  After two steroid injections, Kraabel reported no improvement in his back pain and complained of worsening cervical pain, headaches and numbness in both hands.  (AR 327-28, 331-36.)

On March 19, 2008, Dr. Denise Chang, a physician who works with Dr. Fattouh, examined Kraabel and reported that Kraabel was unable to work and has significant psychosocial stressors, anxiety and depression that contribute to his pain.  (AR 323-25.) Dr. Fattouh gave Kraabel another epidural steroid injection that day but it had no lasting effect.  As a result, Fattouh referred him for a psychological evaluation to determine his suitability for the implantation of a spinal cord stimulator ("SCS").  (AR 315-19.)

---

the court will do the same in citing the administrative record.

3

On March 20, 2008, M. Gretchen Byfield, Ph.D. performed a psychological evaluation of Kraabel that revealed "an extreme level of somatic distress which may cause significant problems in his physical treatment program . . . Somatic obsession and delusion may significantly interfere with pain treatment." She opined that Kraabel "presented as very psychologically frail" and was strongly encouraged to seek psychiatric treatment, although his insurance coverage was ending. (AR 205-07.) Byfield diagnosed a pain disorder with both psychological and medical features, anxiety disorder, depressive disorder and personality disorder. She ruled out posttraumatic stress disorder and assessed Kraabel with a Global Assessment of Functioning ("GAF") score of 40-45.[2] (AR 208.)

On March 26, 2008, Kraabel underwent a functional capacity evaluation as part of his physical therapy program and treatment with Dr. Fattouh. Ferguson, Kraabel's former physical therapist, performed the evaluation and deemed Kraabel able to perform the physical demands of sedentary work, including frequent sitting and occasional standing, walking and postural activities, except for sustained stooping, crouching, bending and overhead reaching. Ferguson noted that Kraabel's endurance was "significantly more than perceived ability" and excellent for his age and gender. Kraabel was able to sit for 55 minutes during an interview and stand in one place for 30 minutes during testing without signs or complaints of discomfort, both significantly longer periods

_____

[2] The GAF scale reports a clinician's assessment of an individual's overall level of functioning. *Sims v. Barnhart*, 309 F.3d 424, 427 n.5 (7th Cir. 2002). A GAF of 41-50 indicates serious symptoms. American Psychiatric Association, Diagnostic and Statistical Manual of Mental Disorders 34 (4th ed. 2000) (Text Revision).

than perceived tolerance.  His pain at the conclusion of the test was 7 out of 10.  (AR 243-47.)

On April 16, 2008, Dr. Chang noted that Kraabel complained of cervical pain and headaches but had a mildly reduced range of motion in his cervical and lumbar spine, a steady gait and full strength in his legs.  She observed that he sat for 30 minutes with no signs of discomfort.  (AR 307-08.)

On April 25, 2008, John B. Martin, Ph.D. issued the results of his psychological evaluation of Kraabel regarding his suitability for a SCS.  He found Kraabel's "expectations for surgery appear reasonable" but "testing indicated potential for psychophysiological contribution to the patient's pain."  Martin also recommended cognitive behavioral pain management and pacing of activities, in addition to improvement of overall coping skills.  (AR 345-46.)  Martin provided counseling to Kraabel in several sessions through October 16, 2008.  (AR 347-51, 441-44.)

After a trial SCS was implanted on June 10, 2008, Kraabel reported a 70-75% reduction in pain, stating that it went from 10/10 to 2/10.  Even though his low back pain significantly improved with the SCS, which was permanently implanted in July 2008, Kraabel continued to complain throughout 2008 about neck pain; headaches occurring up to three times daily; numbness, tingling and weakness in his arms; and tenderness in the implant areas.  He also indicated that movement aggravates his back pain.  (AR 289-90, 293-99, 359-75, 398.)  A July 2008 cervical spine MRI was normal. (AR 392.)  In August 2008, Kraabel told Dr. Chang that his primary impediment to work

was his severe headaches, along with the inability to bend, lift or twist.  (AR 371.)   She completed a form noting that he would need to remain off work until August 27, 2008. (AR 292.)   On September 17, 2008, Kraabel reported 100% pain relief from the SCS; however, the location of the SCS battery became painful and required relocation on September 30, 2008.   The SCS also required readjustment in October 2008.   (AR 359-69).

On November 13, 2008, neurologist Anne C. Weiss, D.O. evaluated Kraabel's headaches, neck pain, and upper extremity tingling.  He reported having at least one headache a day with nausea and increasing severity and that his headaches could increase to 10/10 in severity once or twice a day and last for hours.   Kraabel told Weiss that he was able to walk for 30 minutes daily, which he was unable to do prior to the SCS. Tinel's was positive at the wrists bilaterally.   Dr. Weiss diagnosed mixed vascular tension headaches with a possible post-concussion aspect and chronic neck and low back pain. An EMG assessment was ordered for possible carpal tunnel syndrome.   (AR 399-402.)   A head CT scan was normal.   (AR 408.)

On December 22, 2008, Jonathon L. Tueting, an orthopedic surgeon, evaluated Kraabel and diagnosed him with "bilateral carpal tunnel syndrome, left worse than right, clinical although not electrodiagnostically."   He had a positive Tinel sign and carpal tunnel compression test but normal range of motion.   Kraabel was given an injection in his left carpal canal.   (AR 508, 512-13.)

By December 2008, Kraabel was experiencing low back pain that could not be fully

controlled with the SCS.   Following a surgical revision of the SCS in January 2009, Kraabel reported at several office visits that he had good pain control.   (AR 452-64.)

On January 27, 2009, Kraabel reported numbness in his hands and daily headaches for which he was given Lyrica on a trial basis.  (AR 501-02.)   At a February 24, 2009 follow-up with Dr. Fattouh's office, Kraabel reported numbness and tingling in his arms and occasionally in his left leg.   Although the SCS was controlling his pain, he was having trouble keeping the battery charged.   (AR 450-51.)   At a follow-up visit on February 9, 2009, Dr. Tueting noted that Kraabel's symptoms were limited to the ulnar nerve and recommended splinting his elbows at night.   He diagnosed Kraabel with mild bilateral cubital tunnel syndrome.   (AR 493-94.)

On March 24, 2009, Dr. Weiss noted that Kraabel had been prescribed Lyrica after a successful trial but had not taken it for a month because he lacked health insurance.   She wrote that she had hoped that an increased dose of Amitriptyline would give him more relief but Kraabel denied that it had.   Although his EMG studies were normal, Dr. Weiss noted that "clinically, he may have mild carpal tunnel syndrome." She pointed out, however, that a carpal tunnel brace had not helped but that Kraabel was currently using an elbow brace for cubital tunnel syndrome.   Upon examination, Kraabel's motor strength was 5/5 in his arms and legs and his deep tendon reflexes were 2/4.  (AR 484-86.)

The battery on Kraabel's SCS was replaced on April 16, 2009.  (AR 448.)   On May 21, 2009, Kraabel reported to Dr. Fattouh's office that he had numbness in his arms

and legs but his overall pain had improved by 80%.   He currently rated his low back pain as a 2/10.   Kraabel reported that the SCS helps the numbness in his legs but not his arms.   He stated that he has headaches when the back of his neck hurts and has some pain over the incision site of the SCS battery where there was superficial wound tenderness.   (AR 446-47.)

In June 2009, Kraabel reported to a physician assistant at UW Health that Lyrica 50 mg twice a day, which he received through medication assistance, was very helpful in reducing the frequency and intensity of his headaches.   He stated that he no longer used over-the-counter medications and had no headache during the day.   Kraabel sometimes awakens in the morning with a slight headache, but the Lyrica quickly resolves it.   (AR 475.)

Although Kraabel continued to seek medical assistance at UW Health until at least February 2010 for unrelated conditions and prescription refills, there is no further mention of either his back pain or headaches during those visits.   (AR 467-72.)

### C.    Non-Examining Consultants

On June 11, 2008, medical consultant Dr. Syd Foster found that Kraabel could perform sedentary work with limited reaching and occasional climbing and stooping. (AR 262-69.)

On June 19, 2008, state agency psychologist Jack Spear, Ph.D. found that Kraabel had moderate limitations in his abilities to understand and remember detailed

instructions, carry out detailed instructions, maintain attention and concentration for extended periods, complete a normal workday and workweek without interruption from psychologically-based symptoms, and perform at a consistent pace.   (AR 284-87.)

On December 16, 2008, medical consultant Dr. Michael Baumblatt opined that Kraabel could perform sedentary work with limited reaching and frequent stooping, kneeling and crawling.   (AR 415-21.)

On December 17, 2008, state agency psychologist Roger Rattan, Ph.D, found that Kraabel did not exhibit the requisite number of factors evidencing the presumptively disabling impairments outlined in Listings 12.04 (affective disorders), 12.06 (anxiety-related disorders) or 12.07 (somatoform disorders).[3]   He concluded that with respect to these listings, Kraabel had mild limitations in his daily living activities and social functioning; moderate difficulties maintaining concentration, persistence or pace; and no episodes of decomposition.   Rattan also found that Kraabel had moderate limitations in his abilities to understand and remember detailed instructions; carry out detailed instructions; maintain attention and concentration for extended periods; perform activities within a schedule, maintain regular attendance and be punctual within customary tolerances; complete a normal workday and workweek without interruption from psychologically-based symptoms, and perform at a consistent pace; accept instructions and respond appropriately to criticism from supervisors; and respond appropriately to changes in the work setting.   Rattan wrote that Kraabel was experiencing

---

[3]   The Social Security Administration has compiled a list of presumptively disabling

a significant level of somatic distress which could cause problems with his physical treatment program but that his anxiety and depression were in the average range for persons dealing with pain.   (AR 422-38.)

### D.     Administrative Hearing

At a hearing held on June 15, 2010, before Administrative Law Judge (ALJ) Stephen J. Ahlgren, Kraabel testified that he underwent a spinal cord fusion in September of 2003 and then returned to work until he reinjured his back when he fell in January of 2008.   Kraabel explained that while he now has no pain from his mid-chest down to his feet, he has to keep the stimulator at a high level, which can interfere with his ability to walk and runs down the battery, and he has to be careful as he would not be able to feel pain if he hurt himself.   (AR 33-34, 40-41.)   Kraabel further testified that he can only stand for 5 to 10 minutes before his legs go numb and sit for 10-15 minutes before he has to move around.   (AR 39.)   His hands also go numb while he is sleeping and sometimes during the day.   (AR 44-45.)

Since falling in 2008, Kraabel has had headaches one to four times a day, every day, for which he takes over-the-counter pain medication and Lyrica.   The Lyrica, which he is able to get from the drug company, helps some with the headaches, but after two to four hours, he has to take more pain medication.   Kraabel also testified that although he is not under the care of a psychiatrist, he takes Amitriptyline for depression.   (AR 35-36,

---

impairments in 20 C.F.R. § 404, Subpt. P, App.1 (commonly known as the "Listings").

46.)   He stopped seeing Dr. Martin for psychiatric care in January 2009 when his health insurance became an issue.   (AR 48.)

Kraabel testified that he lives with his father and sister.   He spends the majority of his day caring for his father, who is 81 years old and has dementia.   Kraabel testified that he reads to his father, plays board games with him, cooks for him and helps him clean up.  (AR 38, 41, 45.)   He is able to rest in a chair for an hour or two during the day while his father is resting.   (AR 47.)   With respect to housework, Kraabel dusts, washes dishes and helps with grocery shopping, but he does not do any vacuuming or yard work.   He is able to drive and spends his free time in the evenings going to the park or visiting friends. Kraabel also helps plan a Norwegian folk festival.   (AR 41-43.)

When asked by the ALJ if he would be able to work at a customer service center taking phone calls and entering data into a computer, as long as he could move around at will, Kraabel testified that he would not be able to handle it because of his headaches. Kraabel also explained that he wanted to take something stronger than over-the-counter medication for the pain, but cannot see his doctor without health insurance.   (AR 49.)

### E.    The ALJ's Disability Determination

After considering the documentary evidence and testimony, the ALJ issued a written decision on October 13, 2010, finding that Kraabel was not disabled.   (AR 14-23.)   He concluded that Kraabel had the severe physical impairments of degenerative disc disease of lumbar spine, status post fusion (L4-5, L5-S1), headaches, pain disorder

with both psychological and medical features, anxiety disorder, depressive disorder, personality disorder and post laminectomy syndrome.   (AR 16.)

After considering the medical records, reports from consulting physicians and the hearing testimony, the ALJ adopted the opinions of the medical consultants and physical therapist, finding that Kraabel retained the residual functional capacity (RFC) to perform unskilled, sedentary work.   The ALJ specifically noted that the RFC assessment reflected Kraabel's moderate difficulties in maintaining concentration, persistence or pace.   (AR 18-19.)   To the extent inconsistent with his RFC assessment, the ALJ found Kraabel's testimony "not credible" with respect to the intensity, persistence and limiting effects of his symptoms.

As a result of the above findings, the ALJ concluded that Kraabel was not able to perform his past work as a critical care nurse technician, nurse assistant, sales associate and photo specialist.   The ALJ applied the Medical-Vocational Guidelines (often referred to as "the grids") to determine whether Kraabel could make a vocational adjustment to other work in light of his age, education, work experience and residual functional capacity.   Citing Rule 201.28 of the grids, the ALJ found that Kraabel would not be disabled if he could perform a full range of sedentary work.   Although the ALJ acknowledged that the rule provided only a "framework" for decision-making if Kraabel had "non-exertional limitations," the ALJ found that Kraabel's additional limitations have "little or no effect on the occupational base of unskilled sedentary work."   Accordingly, the ALJ concluded that the rule directed a finding of "not disabled."   (AR 22.)

The Appeals Council affirmed the ALJ's decision on October 24, 2011.[4]   (AR 7.)

Kraabel now seeks judicial review of that decision.


OPINION

Kraabel contends that the ALJ erred in two respects:   (1) determining that Medical-Vocational Rule 201.28 directed a finding of not disabled; and (2) finding his testimony was not credible.   These arguments are addressed in turn below.


I.  **Application of the Grids**

The last step of the sequential evaluation process requires the ALJ to show that the claimant can perform some other job in the national economy.   He can satisfy this burden by relying on one of the Medical-Vocational Guidelines found in 20 C.F.R., Subpart P, App. 2.   *Caldarulo v. Bowen*, 857 F.2d 410, 413 (7th Cir. 1988).   These rules take administrative notice of the numbers of unskilled jobs that exist throughout the national economy at the various functional levels (sedentary, light, medium, heavy and very heavy), taking into account the other vocational factors of age, education and work experience.   20 C.F.R., Subpart P, App. 2, § 200.00(a) and (b).   Because the rules account only for limitations that affect the person's ability to meet the exertional requirements of jobs, they are dispositive only when the person's limitations are exertional in nature (e.g., limitations on sitting, standing, and amount of weight lifted).   20 C.F.R.,

---

[4]   The Appeals Council's affirmance of the ALJ's decision constitutes the final decision of the

Subpart P, App. 2, § 200.00(e).   When a person has additional nonexertional limitations (such as limitations on the ability to balance, manipulate objects, hear, see, perform mental tasks or tolerate environmental conditions), the guidelines provide a "framework for consideration" and the administrative law judge must cite other evidence for his conclusion that significant numbers of jobs exist in the economy that the claimant can perform.   *Id.*

The regulations recognize that in some cases, a person's nonexertional limitations may be so insignificant that it is obvious they would not diminish the relevant job base and the relevant grid may still be applied.   Soc. Sec. Ruling 83-14.   In "more complex" cases, however, the administrative law judge may need the assistance of a vocational expert.   *Id.*   The Court of Appeals for the Seventh Circuit has said that an ALJ must consult a vocational expert "only when the non-exertional limitations 'substantially reduce a range of work an individual can perform.'"   *McKinzey v. Astrue*, 641 F.3d 884, 892 (7th Cir. 2011) (quoting *Luna v. Shalala*, 22 F.3d 687, 692 (7th Cir. 1994)); *see also Warmoth v. Bowen*, 798 F.2d 1109, 1112 (7th Cir. 1986) (no vocational expert required if "reliable evidence of some kind that would persuade a reasonable person that the limitations in question do not significantly diminish the employment opportunities otherwise available").

In this case, the ALJ found that Kraabel did not have any nonexertional limitations that had significant impact on his ability to perform a full range of unskilled sedentary

---

Commissioner of Social Security.   *Getch v. Astrue*, 539 F.3d 473, 480 (7th Cir. 2008).

work.  Kraabel argues that this conclusion is inconsistent with the ALJ's finding that Kraabel suffered from the severe impairments of headaches, pain disorder with psychological and medical features, anxiety disorder, depressive disorder, personality disorder and post laminectomy syndrome (chronic pain after back surgery), which all result in nonexertional limitations.  According to Kraabel, because a severe impairment is one that "significantly limits your physical or mental ability to do basic work activities," 20 CFR §§ 404.1520(c), 416.920(c), the ALJ erred in failing to account for these impairments in his RFC assessment.

Although the court agrees that some of the impairments identified by the ALJ could possibly result in a nonexertional restriction or limitation, "it is the nature of an individual's limitations and restrictions, not certain impairments or symptoms, that determines whether the individual will be found to have only exertional limitations or restrictions, only nonexertional limitations or restrictions, or a combination of exertional and nonexertional limitations or restrictions."   SSR 96-9.

> For example, even though mental impairments often affect nonexertional functions, they may also limit exertional capacity affecting one of the seven strength demands; e.g., from fatigue or hysterical paralysis.  Likewise, symptoms, including pain, are not intrinsically exertional or nonexertional; when a symptom causes a limitation in one of the seven strength demands, the limitation must be considered exertional.

*Id.*

Although Kraabel generally refers to his severe back pain, headaches, carpal and cubital tunnel syndrome and mental impairment, he fails to identify any particular nonexertional limitation resulting from these conditions that the ALJ ignored or

15

misinterpreted in making his RFC assessment and applying the grids. Kraabel asserts that the ALJ ignored his complaints of pain and headaches; however, the ALJ thoroughly discussed both in his decision, finding that his back pain and headaches had greatly improved with treatment.

Importantly, the ALJ based this assessment no just on his determination of Kraabel's credibility, but on the results of Dr. Fattouh's March 2008 functional capacity evaluation and the findings of the state agency physicians. *All* found Kraabel capable of sedentary work. Although there is some indication that Kraabel could not perform sustained overhead reaching and had moderate limitations in maintaining concentration, persistence or pace -- which are nonexertional limitations -- Kraabel does not argue that he had significant restrictions in these areas, nor is there evidence in the record to support such a finding. With respect to the mental impairments, the ALJ explained his RFC specifically incorporated Kraabel's moderate limitations because it limited him to unskilled work. The ALJ further found that Kraabel's physical condition directly affected his mental condition, findings well-supported by the reports of Dr. Fattouh, Dr. Chang, Dr. Martin and Dr. Byfield. As a result, there is substantial support in the record for the ALJ to conclude that Kraabel's mental condition improved after he received significant pain relief from the SCS and Lyrica. Finally, Kraabel was diagnosed with only mild carpal tunnel syndrome and was not assessed with any manipulative restrictions.

In sum, the ALJ did not need to consider the testimony of a vocational expert because there was no reliable evidence that any nonexertional limitation significantly

diminished the unskilled, sedentary employment opportunities available to Kraabel. *Howell v. Sullivan*, 950 F.3d 343, 349 (7th Cir. 1991) (application of grids is appropriate where ALJ found plaintiff had no significant nonexertional limitations).

## II.      Credibility Determination

The ALJ also set forth substantial, evidence-based ground for discounting Kraabels' reports of disabling pain and headaches.   First, the ALJ found Kraabel's own report of his daily activities were not limited to the extent that one might reasonably expect for such debilitating pain and headaches.   Second, the ALJ found Kraabel had made inconsistent statements about his abilities and the frequency of his headaches.   Third, the ALJ found the objective medical evidence did not show disabling levels of pain, including Kraabel's own report that the SCS provided him with 100% pain relief.   (AR 21.)

Kraabel argues that the ALJ erred in finding that the SCS was effective and provided 100% pain relief because the SCS malfunctioned shortly after it was implanted and required further surgical revision.   However, the ALJ provided a detailed discussion and analysis of the spinal cord stimulator, including (1) the problems that Kraabel had with the battery location, (2) pain near the battery site, (3) pain coverage in his left leg and (4) revision surgery.   Nevertheless, as the ALJ noted, the medical records indicate that despite these issues, Kraabel continued to report significant improvement in his pain levels (between 75 and 100 percent) from the SCS between June 2008 and May 2009. On May 21, 2009, Kraabel reported to Dr. Fattouh's office that his overall pain had

improved by 80% and rated it a "2" on a ten point scale.   He also reported that the SCS helped the numbness in his legs.   Finally, the ALJ pointed out that even though Kraabel claimed an inability to sit for more than 10 minutes at a time, he was able to sit without discomfort for 55 minutes during his functional evaluation and for 30 minutes during an office visit.

Kraabel also challenges the ALJ's finding that he has no headaches during the day, arguing that they were a significant problem in August 2008, remained uncontrolled until June 2009 and still required pain medication at the time of the hearing.   As noted by the ALJ, however, the medical record also shows that Kraabel's headaches were significantly decreased in frequency and intensity after he began a successful Lyrica trial in January 2009.   This improvement was noted through June 2009, when Kraabel reported that he no longer used over-the-counter medications, had no headache during the day and found Lyrica quickly resolved the "slight" headaches that he got in the mornings.   Although Kraabel claims that he could not seek help for his headaches because he lacks medical insurance, he was able to visit UW Health until at least February 2010 for various health concerns and prescription refills.   As the ALJ noted, Kraabel never mentioned either his back pain or headaches during those visits.

Finally, Kraabel challenges the ALJ's finding that the level of care of he provides his father is not inconsistent with allegations of disabling pain, arguing that he only reads to his father and makes sure that his father does not wander off, takes his medication and remembers to bathe.   The ALJ pointed out, however, that Kraabel acknowledged

performing these tasks with only minimal rest, even when he claimed to have headaches three times a day.   The ALJ further noted that Kraabel acknowledged being able to do some laundry, make microwave meals, dust, spend time with others *and* shop every two weeks.

Ultimately, the record before the court shows that the ALJ considered the relevant factors, gave specific reasons for not believing Kraabel's assertions that his pain and headaches precluded him from working, *and* those reasons are supported by the record. *Skarbeck v. Barnhart*, 390 F. 3d 500, 505 (7th Cir. 2004) (court will affirm credibility determination if ALJ gives specific reasons that are supported by record).   The ALJ built a sufficiently accurate and logical bridge from the evidence to her conclusion that Kraabel's subjective complaints about his inability to work were not credible.   *Shramek v. Apfel*, 226 F.3d 809, 811 (7th Cir. 2000).   As a result, Kraabel has not demonstrated that this court should disturb the ALJ's credibility finding.   *Sims v. Barnhart*, 442 F.3d 536, 538 (7th Cir. 2006) (credibility determinations can rarely be disturbed by a reviewing court); *Powers v. Apfel*, 207 F.3d 431, 435 (7th Cir. 2000) (credibility determination will be upheld unless it is "patently wrong").

ORDER

IT IS ORDERED that the decision of defendant Michael J. Astrue, Commissioner of Social Security, is AFFIRMED, and that plaintiff David Kraabel's appeal is DISMISSED.   The clerk of court is directed to enter judgment in favor of defendant and

close this case.

Entered this 15th day of October, 2013.

BY THE COURT:

/s/

_____
WILLIAM M. CONLEY
District Judge